85 F.3d 1400
 Bankr. L. Rep. P 76,999, 96 Cal. Daily Op. Serv. 4015,
96 Daily Journal D.A.R. 6506
In re Alan J. STERNBERG, Debtor.
Amy R. FRIEDKIN, formerly, Amy R. Sternberg, Plaintiff-Appellee,
v.
Alan J. STERNBERG, Defendant-Appellant.
 No. 95-15414.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 16, 1996.
Decided June 5, 1996.
 
 Joel K. Belway, San Rafael, California, for defendant-appellant.
 Howard D. Neal, Neal & Associates, Oakland, California, for plaintiff-appellee.
 Appeal from the United States District Court for the Northern District of California D. Lowell Jensen, District Judge, Presiding, D.C. No. CV-94-03392.
 Before: ALARCON, BEEZER, and RYMER, Circuit Judges.
 ALARCON, Circuit Judge:
 
 
 1
 Alan J. Sternberg ("Sternberg") is a debtor in Chapter 11 bankruptcy. Amy R. Friedkin ("Friedkin"), Sternberg's former spouse, filed a complaint in Sternberg's Chapter 11 case which sought a determination that certain monthly sums owed to her by Sternberg were spousal support payments and thus nondischargeable under 11 U.S.C. § 523(a)(5). The bankruptcy court determined that the monthly payments were intended to be spousal support and entered judgment in favor of Friedkin. The district court affirmed the judgment of the bankruptcy court. In his appeal before this court, Sternberg contends that the bankruptcy court erred by: (1) concluding that the monthly obligations were for spousal support instead of payments on a division of marital property;[1] (2) failing to award prejudgment interest on Sternberg's setoff claim; and (3) excluding evidence of Friedkin's current financial circumstances. Because we conclude that the bankruptcy court did not abuse its discretion, we affirm the order of the district court.
 
 
 2
 * Friedkin and Sternberg were married on January 1, 1968. After the Sternberg's second child was born in 1971, Friedkin did not work outside the home except for a two-month period of employment at the Jewish Federation. Friedkin and Sternberg separated in 1985 and Friedkin filed for a divorce in the Superior Court of California in Contra Costa County. Pending resolution of the divorce proceeding, the state court entered an order on April 15, 1996 which awarded Friedkin temporary spousal support in the amount of $8,640 per month and temporary child support in the amount of $5,360 per month.
 
 
 3
 After they separated, Friedkin and Sternberg began negotiating a "Marital Settlement Agreement" (the "Settlement Agreement"). At the time of these negotiations, Friedkin had no independent source of income. Friedkin testified at the bankruptcy trial that when she did not receive the support payments, she had to borrow money from family and friends. In contrast, Sternberg testified that in 1986 he earned a salary of approximately $100,000 a year and derived additional income from various real estate investment partnerships. While neither party clearly sets forth the extent of Sternberg's investment income, Sternberg testified that he had assets worth between seven and eight million dollars and that the cash flow from the real estate partnerships allowed the Sternbergs to spend approximately $400,000 on home renovations in 1985.
 
 
 4
 After approximately a year of negotiations, Friedkin and Sternberg entered into the Settlement Agreement on September 11, 1986. Both parties initialed each of the 38 pages of the Settlement Agreement. The Settlement Agreement contains a section entitled "SPOUSAL SUPPORT" and a section entitled "DIVISION OF PROPERTY."
 
 
 5
 The DIVISION OF PROPERTY section stated that it was the "general intention of the parties" that Sternberg "receive all of the marital estate ... excepting therefrom only the real property and family residence ... together with the sum of $2,000,000...." The Settlement Agreement provided that Sternberg was to pay Friedkin $2,000,000 on or before March 1, 1987. The Settlement Agreement also provided for Friedkin to transfer all of her interest in the couple's real estate partnerships/investments to Sternberg. Similarly, Sternberg was required to transfer his interest in the couple's residence and an adjacent lot to Friedkin. Sternberg had a seven-year right of first refusal to purchase the residence and lot if Friedkin elected to sell these properties.
 
 
 6
 The SPOUSAL SUPPORT portion of the Settlement Agreement provided for Sternberg to pay Friedkin "interim spousal support payments" of $8,000 per month from June 1986 until January 1987. If Sternberg made the $2,000,000 payment on or before March 1, 1987, Sternberg's monthly payment obligations would cease. Sternberg's $2,000,000 obligation would be reduced by each of the $8,000 monthly payments he had made to Friedkin. If Sternberg failed to make the $2,000,000 payment by March 1, 1987, however, he would not receive any credit for payments made. In this event, the Settlement Agreement provided that Sternberg would commence "additional interim spousal support payments [in the] sum of $12,000 per month ... until the $2,000,000 payment is made...." The $12,000 monthly payments were not deductible against the $2,000,000 payment. The $12,000 monthly payments were to survive Friedkin's remarriage and were not to be taxable to Friedkin. Once Sternberg paid the $2,000,000, Friedkin's right to spousal support would "be forever extinguished." The Settlement Agreement was incorporated into the judgment for dissolution by the state court on October 22, 1986.
 
 
 7
 Sternberg did not pay Friedkin the $2,000,000 on or before March 1, 1987. Friedkin testified that Sternberg made the required monthly payments only "sporadically." In March or April of 1989, Friedkin sold the residence and adjacent lot for a total of $1,570,000. She did not give Sternberg notice of her intention to sell. Under the Settlement Agreement, Sternberg had the right to purchase the property for $1,000,000. On May 4, 1989, Sternberg and Friedkin entered into a stipulation to resolve the pending disputes over alleged defaults of the Settlement Agreement. The stipulation provided for Sternberg to pay Friedkin $255,000 immediately and $125,000 on May 4, 1990. If Sternberg failed to make the $125,000 payment on May 4, 1990, the parties agreed that "all of the terms and conditions of the [Settlement Agreement] shall be reinstated...." The stipulation also provided that "[u]nder no circumstances whatsoever shall [Sternberg]'s right of first refusal ... be reinstated in any fashion." Sternberg failed to make the $125,000 payment on or before May 4, 1990.
 
 
 8
 In 1992, Sternberg filed a petition for relief under Chapter 11 of the Bankruptcy Code. On January 21, 1993, Friedkin filed a complaint in Sternberg's Chapter 11 bankruptcy case in which she sought a determination that Sternberg's monthly obligations under the Settlement Agreement were for spousal support and thus nondischargeable under 11 U.S.C. § 523(a)(5).
 
 
 9
 On October 12, 1993, after conducting a trial, the bankruptcy court held that the $8,000 monthly payments were property settlement payments. The bankruptcy court also ruled, however, that the $12,000 monthly payments were for spousal support and were thus nondischargeable. The bankruptcy court further held that Sternberg was entitled to an offset for Friedkin's breach of Sternberg's right of first refusal.[2]
 
 
 10
 On May 9, 1993, the bankruptcy court entered an "Amended Judgment After Trial of Adversary Proceeding" which stated that Sternberg's support obligations were nondischargeable. The bankruptcy court found that Sternberg was entitled to an offset of $570,000 and awarded Friedkin a net judgment in the amount of $230,198.07 plus costs and reasonable attorney's fees. Except for an award of interest from April 6, 1989 to May 4, 1989 (the interim period between Friedkin's breach of the Settlement Agreement and the parties' execution of the stipulation) Sternberg was not awarded prejudgment interest. Sternberg appealed from the entry of this judgment to the district court. The district court entered an order affirming the judgment of the bankruptcy court. Sternberg timely appeals to this court.
 
 II
 
 11
 We independently review the bankruptcy court's decision without deference to the district court's conclusions. In re Weisman, 5 F.3d 417, 419 (9th Cir.1993). This court thus applies the same standard of review employed by the district court. In re Siragusa, 27 F.3d 406, 407 (9th Cir.1994).
 
 
 12
 The right to a discharge is generally left to the sound discretion of the bankruptcy court. In re Cox, 904 F.2d 1399, 1401 (9th Cir.1990) (citing Shaver v. Shaver, 736 F.2d 1314, 1316 (9th Cir.1984)). A bankruptcy court's determination of nondischargeability is thus reviewed on appeal for "gross abuse of discretion."[3] Id. (quoting Shaver, 736 F.2d at 1316). A trial court's decision whether to award prejudgment interest is reviewed for abuse of discretion. In re Acequia, Inc., 34 F.3d 800, 818 (9th Cir.1994).
 
 
 13
 A trial court may abuse its discretion in several ways. A trial court abuses its discretion if it fails to apply the correct law or if it bases its decision on a clearly erroneous finding of a material fact. Cox, 904 F.2d at 1401; Engleson v. Burlington N. R.R. Co., 972 F.2d 1038, 1043 (9th Cir.1992). A trial court also abuses its discretion if it applies the correct law to facts which are not clearly erroneous but rules in an irrational manner. Id., 972 F.2d at 1043.
 
 III
 
 14
 * Section 523(a)(5) of the Bankruptcy Code provides that a debt owed "to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement" is not dischargeable. 11 U.S.C. § 523(a)(5). This section represents a departure from the general policy of giving a debtor a "fresh start" following his or her bankruptcy and instead "enforces an overriding public policy favoring the enforcement of familial obligations." Shaver, 736 F.2d at 1315-16. In contrast, until section 523 was amended in 1994, property settlement payments were dischargeable in bankruptcy. In re Pederson, 875 F.2d 781, 784 (9th Cir.1989). "Because of the federal interests reflected in the Bankruptcy Act, the courts look to federal law to determine whether an obligation is 'actually in the nature of ... support.' " Shaver, 736 F.2d at 1316 (citation omitted).
 
 
 15
 In determining whether a debtor's obligation is in the nature of support, the intent of the parties at the time the settlement agreement is executed is dispositive. See In re Sampson, 997 F.2d 717, 723 (10th Cir.1993) ("the critical inquiry is the shared intent of the parties at the time the obligation arose"); In re Combs, 101 B.R. 609, 615 (9th Cir. BAP 1989) ("the court must ascertain the intention of the parties at the time they entered in their stipulation agreement"); see also Shaver, 736 F.2d at 1317 (concurring with district court that "the intent of the parties in entering into the settlement agreement was to provide support to [the spouse]"). The intent of the parties is a factual finding reviewed for clear error. United States v. City of Twin Falls, 806 F.2d 862, 869 (9th Cir.1986), cert. denied, 482 U.S. 914, 107 S.Ct. 3185, 96 L.Ed.2d 674 (1987); In re Robb, 23 F.3d 895, 898 (4th Cir.1994).
 
 
 16
 A trial court should consider several factors in determining how the parties intended to characterize the obligation. Shaver, 736 F.2d at 1316. Foremost, the trial court should consider whether the recipient spouse actually needed spousal support at the time of the divorce. Id. In determining whether spousal support was necessary, the trial court should examine if there was an "imbalance in the relative income of the parties" at the time of the divorce decree. Id. The trial court should also consider whether the obligation terminates upon the death or remarriage of the recipient spouse and whether the payments are "made directly to the recipient spouse and are paid in installments over a substantial period of time." Id. at 1316-17. Finally, the labels given to the payments by the parties may be looked at as evidence of the parties' intent. Combs, 101 B.R. at 616; Sampson, 997 F.2d at 723.
 
 
 17
 In the present case, the bankruptcy court explained that the relevant test was "the intent of the parties [ ] at the time the agreement was made...." The bankruptcy court found that the language of the Settlement Agreement, Friedkin's need for spousal support, and the disparity between Friedkin's and Sternberg's income and assets at the time the Settlement Agreement was executed, weighed in favor of finding an intent to provide spousal support. The bankruptcy court also considered other factors, such as the survival of the payments past Friedkin's remarriage and the tax treatment of the payments, but determined that these factors were not dispositive of the parties' intent.
 
 
 18
 The bankruptcy court's finding that Friedkin and Sternberg intended to create a spousal support obligation is not clearly erroneous. It is undisputed that, at the time the parties entered into the Settlement Agreement, Friedkin was unemployed and had not been permanently employed since 1971. It is also undisputed that, at the time of the divorce, Friedkin had no source of income and, aside from the residence, no assets. In contrast, Sternberg testified that, at the time of the divorce, he had a salary of approximately $100,000 and assets worth between seven and eight million dollars. A rational fact-finder could infer from this evidence that Friedkin needed spousal support and that there was a large imbalance in the relative incomes of Friedkin and Sternberg. These facts strongly support a finding that Friedkin and Sternberg intended to create a spousal support obligation. See Shaver 736 F.2d at 1317 (upholding spousal support finding where recipient spouse "was unemployed and possessed no special job-related skills"); Combs, 101 B.R. at 617 (upholding spousal support finding where recipient spouse was an unemployed legal secretary and payor spouse was employed attorney); In re Brody, 3 F.3d 35, 37-38 (2d Cir.1993) (upholding spousal support finding where recipient spouse testified that a $1,000,000 payment labeled "Distributive Award" was intended to generate yearly income to be used "for her own support"). As the district court noted in its order, "[i]f these provisions were not intended to be support, then it appears that Friedkin would have received no support at all from Sternberg and only the house and lot as property at the time of the dissolution, a seemingly anomalous result."
 
 
 19
 Friedkin's and Sternberg's intent to create a spousal support obligation is also evidenced by the express language of the Settlement Agreement which refers to the $12,000 monthly payments as "spousal support" and the $2,000,000 sum as "division of property." There is no evidence that Sternberg, a practicing attorney for 20 years, used these terms loosely.[4] See Sampson 997 F.2d at 723 (stating that an obligation entitled "Maintenance (Spousal Support)" was persuasive evidence of the parties' intent to create a spousal support obligation). Finally, although not discussed by the bankruptcy court, the fact that the sums were paid in monthly increments over an extended period of time is indicative of support. See Shaver, 736 F.2d at 1317 (upholding bankruptcy court's finding of spousal support where decree "provided for installment payments over a substantial period of time").
 
 
 20
 * Sternberg argues that because the Settlement Agreement provided that the $12,000 payments were not taxable to Friedkin and were to survive Friedkin's remarriage, the bankruptcy court clearly erred in finding an intent to create spousal support. We disagree. "Those courts which have looked to the tax treatment of the obligation ... have usually done so as part of an overall analysis involving many other factors, and have rarely found the tax treatment of a debt dispositive on dischargeability." Sommer, McGarity & King, Collier Family Law and the Bankruptcy Code, § 6.04 at p. 6-48 (1995); see also In re Kritt, 190 B.R. 382, 388-89 (9th Cir. BAP 1995) (holding that a spouse's failure to report payments as taxable income did not preclude a finding that the parties intended the payments as spousal support). Similarly, survival of the debt upon a spouse's remarriage is not viewed as a dispositive factor. See Shaver 736 F.2d at 1316 ("if an obligation terminates on the death or remarriage of the recipient spouse, a court may be inclined to classify the agreement as one for support") (emphasis added). Moreover, as the bankruptcy court noted, California allows divorcing parties to agree to extend spousal support payments beyond the recipient spouse's remarriage. See Cal.Civ.Code § 4801(b) (recodified in Cal.Fam.Code § 4337). Friedkin's and Sternberg's election to extend the support payments beyond remarriage is therefore not in conflict with an intent to provide spousal support under California law.
 
 2
 
 21
 Sternberg also argues that the bankruptcy court's nondischargeability determination should be reversed because the bankruptcy court erred in concluding that the Settlement Agreement contained "a modifiability provision" and "that the $12,000 monthly payment provisions of the [Settlement Agreement] are modifiable." Sternberg's argument overstates the bankruptcy court's holding. In its tentative oral ruling on October 12, 1993, the bankruptcy court commented, "[o]n the issue of jurisdiction, if I thought that the [state] court could not modify this obligation, based on changed circumstances, I would find it to be dischargeable." At a subsequent hearing, however, the bankruptcy court modified its observation. Sternberg's counsel requested that the bankruptcy court include a statement in the judgment that "the state court judgment is modifiable." The bankruptcy court responded that in its earlier reference to modification, it meant only that "the state court had the jurisdiction to modify [the payments], if it chose, and that's all." (emphasis added). The bankruptcy court explained that its nondischargeability determination did not depend on whether the state court actually determined that the payments were modifiable. The bankruptcy court stated, "I don't think what I intended to say in this, in this ruling, was that I would reverse myself if a state court refused to modify it.... That's not what I meant at all."[5]
 
 
 22
 The bankruptcy court did not err in failing to determine if the payments were modifiable. Whether the monthly payments are modifiable under state law is not a dispositive factor in determining whether the parties intended to create a spousal support obligation for purposes of 11 U.S.C. § 523(a)(5). See In re Williams, 703 F.2d 1055, 1057 (8th Cir.1983) (upholding bankruptcy court's finding of spousal support notwithstanding the fact that the decree expressly labeled the obligation as a "property settlement" in order to prevent modification of the payments by the state court); cf. Sommer, McGarity & King, Collier Family Law and the Bankruptcy Code, § 6.04 at p. 6.46 (1995) ("modifiability by itself is rarely sufficient"); see also Matter of Albin, 591 F.2d 94, 97 (9th Cir.1979) (interpreting Virginia law and upholding district court's finding of spousal support "notwithstanding the fact that appellant's obligations were not subject to modification"). Whether the Settlement Agreement's provisions, and the subsequent conduct of the parties, would support a change in the award of spousal support is a matter that is appropriately left to California state courts. See In re Siragusa, 27 F.3d 406, 408 (9th Cir.1994) (bankruptcy court should impinge on state domestic relations issues "in the most limited manner possible." (quoting In re Harrell, 754 F.2d 902 (11th Cir.1985)); see also Cal.Fam.Code § 4336(a).
 
 
 23
 In sum, the bankruptcy court's finding that the parties intended to create a spousal support obligation is plausible in light of the evidence that Friedkin needed spousal support and that the parties labeled the obligation as "spousal support." While other evidence arguably supports an inference that the parties intended the obligation to be a property settlement, it is not the province of the appellate court to reweigh the evidence and choose between competing inferences. See Anderson v. Bessemer City, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) ("[i]f the [trial] court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently"). Because the bankruptcy court applied the proper legal standard and did not clearly err in determining that the parties intended to create a spousal support obligation, the bankruptcy court did not abuse its discretion in concluding that the $12,000 monthly payments were nondischargeable.
 
 B
 
 24
 Sternberg next challenges the bankruptcy court's denial of his request for prejudgment interest on his offset award. Sternberg argues that "interest should run from the date of Friedkin's breach of the [Settlement Agreement]," in order to compensate him for "the loss of use of the money." We disagree.
 
 
 25
 "[T]he award of prejudgment interest in a case under federal law is a matter left to the sound discretion of the trial court. Awards of prejudgment interest are governed by considerations of fairness and are awarded when it is necessary to make the wronged party whole." In re Acequia, Inc., 34 F.3d 800, 818-19 (9th Cir.1994) (citation omitted). Bankruptcy courts traditionally award prejudgment interest from the time the claimant makes a demand on his or her claim or initiates an adversary proceeding. Id. (citing Turner v. Davis, Gillenwater & Lynch (In re Investment Bankers, Inc.), 4 F.3d 1556, 1566 (10th Cir.1993)), cert. denied, --- U.S. ----, 114 S.Ct. 1061, 127 L.Ed.2d 381 (1994).
 
 
 26
 Here, the bankruptcy court found that Sternberg did not assert a revival of his right to first refusal claim until Friedkin's adversary proceeding was tried on October 12, 1993. Because the trial date represents the date of Sternberg's demand for his setoff claim, the bankruptcy court did not abuse its discretion in holding that interest could not accrue prior to that time.
 
 C
 
 27
 Finally, Sternberg asserts that "the Bankruptcy Court should have considered the [financial] circumstances of Friedkin, relative to Sternberg, at the trial of this matter." Evidentiary rulings are reviewed for an abuse of discretion and should not be reversed absent a showing of prejudice. City of Long Beach v. Standard Oil Co., 46 F.3d 929, 936 (9th Cir.1995).
 
 
 28
 As a preliminary matter, Sternberg does not explain why this information is relevant to a determination of whether the obligation is nondischargeable or how the bankruptcy court's exclusion of the evidence prejudiced him. Matters not sufficiently raised and argued should not be considered by this court. Officers for Justice v. Civil Service Comm'n, 979 F.2d 721, 726 (9th Cir.1992), cert. denied, 507 U.S. 1004, 113 S.Ct. 1645, 123 L.Ed.2d 267 (1993).
 
 
 29
 Assuming that Sternberg intended to argue that Friedkin's present financial circumstances are relevant to a determination of whether the parties intended to create a spousal support obligation, the bankruptcy court did not abuse its discretion in excluding the evidence. As is discussed, supra, the relevant inquiry is the intent of the parties at the time the divorce decree or settlement agreement was executed. See Combs, 101 B.R. at 615 ("the court must ascertain the intention of the parties at the time they entered in their stipulation agreement [citation omitted] and not the current circumstance of the parties").
 
 IV
 
 30
 The district court's order upholding the judgment of the bankruptcy court is AFFIRMED.
 
 
 
 [1]
 At the time Sternberg filed his bankruptcy petition, a property settlement debt was dischargeable in bankruptcy. In 1994, the Bankruptcy Code was amended. All debts arising out of a marital dissolution agreement are now generally nondischargeable. See 11 U.S.C. § 523(a)(15) (applicable to bankruptcy proceedings filed on or after October 22, 1994)
 
 
 [2]
 Friedkin does not appeal from the bankruptcy court's ruling that the $8,000 monthly payments were property settlement obligations, or the bankruptcy court's finding of a setoff claim
 
 
 [3]
 The difference, if any, between an "abuse of discretion" and a "gross abuse of discretion" is unclear. Cox, 904 F.2d at 1401. Because we conclude that the bankruptcy court did not abuse its discretion, we do not reach the question of whether the bankruptcy court grossly abused its discretion
 
 
 [4]
 When questioned by the district court during oral argument, Sternberg's counsel represented that the parties used the term "spousal support" to protect the payments in the event of bankruptcy. We agree with the district court that Sternberg's stated intent to create a nondischargeable debt supports a finding that the parties intended to create a nondischargeable support obligation
 
 
 [5]
 It is unclear whether Sternberg contests the bankruptcy court's finding that the state court retained jurisdiction to consider whether the spousal support obligations could be modified. To the extent he does, we conclude that the bankruptcy court did not err. The bankruptcy court based its conclusion on III.G of the Settlement Agreement which provided that if Sternberg "substantially defaults upon his obligation to pay [Friedkin] the sum of $2,000,000 ..., the [state] Court shall retain jurisdiction to make an Order for spousal support in favor of either party but that such award of spousal support as well as the Court's jurisdiction to make such award of spousal support shall be forever extinguished ... at such time as [Sternberg] pays the sum of $2,000,000." (emphasis added). We review contractual interpretation de novo. Kemmis v. McGoldrick, 767 F.2d 594, 597 (9th Cir.1985). We agree with the bankruptcy court that section III.G of the Settlement Agreement sets forth a clear expression of the parties' intent that the state court retain jurisdiction to enter a new order for spousal support in the event that Sternberg "substantially defaults on his obligation to pay [Friedkin] the sum of $2,000,000."